WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (pro hac vice pending)
(stephen.karotkin@weil.com)
Jessica Liou (pro hac vice pending)
(jessica.liou@weil.com)
Theodore Tsekerides (pro hac vice pending)
(theodore.tsekerides@weil.com)
Matthew Goren (pro hac vice pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>      **Debtor.**<br><br>**Tax I.D. No. 94-3234914** | Case Nos. 19 -_____ (___)<br>     19 -_____ (___)<br><br>Adv. Pro. No. 19-_____ (___)<br><br>Chapter 11 |
| **In re:**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>      **Debtor.**<br><br>**TAX I.D. NO. 94-0742640** | |
| **PG&E CORPORATION,<br>PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**FEDERAL ENERGY REGULATORY COMMISSION**<br><br>      **Defendant.** | **DEBTORS' COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF** |

DEBTORS' ADV. COMPL.

In accordance with 28 U.S.C. § 2201, 11 U.S.C. §§ 105, 106(a), 362(a), and 365, and Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 7001(7), (9) and 7065, PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and as Plaintiffs in the above-captioned adversary proceeding, allege for their complaint ("**Complaint**") for declaratory judgment and preliminary and permanent injunctive relief against the Federal Energy Regulatory Commission ("**FERC**"), upon knowledge of their own acts and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1. Aware from required public filings that the Debtors would be seeking Chapter 11 protection on January 29, 2019, beginning on January 18, 2019, several counterparties to wholesale power purchase agreements with the Debtors initiated proceedings before FERC requesting—on an expedited basis—that FERC order that "if it files a petition for bankruptcy, PG&E may not abrogate, amend or reject in bankruptcy any of the rates, terms and conditions of its wholesale power purchase agreements subject to [FERC]'s jurisdiction without first obtaining approval from [FERC]" (the "**FERC Proceedings**"). On January 25, 2019, FERC issued an order concluding that "this Commission and the bankruptcy courts have concurrent jurisdiction to review and address the disposition of wholesale power contracts sought to be rejected through bankruptcy," (the "**NextEra Order**"). A copy of the NextEra Order is attached as **Exhibit 1**. On January 28, 2019, FERC issued an order, in a separate proceeding, reaching a substantially similar conclusion (the "**Exelon Order**," and together with the NextEra Order, the "**FERC Order**"). A copy of the Exelon Order is attached hereto as **Exhibit 2**.

2. This adversary proceeding arises out of the Debtors' request that this Court: (i) issue a declaratory judgment confirming its exclusive jurisdiction over the Debtors' rights to reject certain executory power purchase agreements or other FERC-regulated agreements (collectively "**PPAs**") under section 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and further declaring that FERC does not have "concurrent" jurisdiction, or any jurisdiction, over the

determination of whether the Debtors' rejection of any of their PPAs should be authorized, and that the Debtors do not need to obtain approval from FERC to reject any of their PPAs; and (ii) pursuant to section 362 of the Bankruptcy Code, issue an order enforcing the automatic stay as to the FERC Proceedings, any entity's attempt to enforce the FERC Order, and any action by FERC, or any other entity, that would attempt to divest or otherwise nullify or impede this Court's exclusive authority to approve or deny the Debtors' requests to assume or reject executory contracts under section 365 of the Bankruptcy Code (collectively, "**FERC Action**"); and (iii) to the extent the automatic stay does not apply, exercise its powers under section 105 of the Bankruptcy Code to preliminarily and permanently enjoin any FERC Action, in order to preserve the Bankruptcy Court's jurisdiction, as well as to prevent irreparable harm to the Debtor's estates and the reorganizational goals of the Bankruptcy Code. To be clear, the Debtors have not made any decisions yet regarding whether to assume or reject any PPAs in these Chapter 11 Cases.

**THE PARTIES**

3. PG&E Corp. is a holding company whose primary operating subsidiary is the Utility, a public utility operating in northern and central California. The Utility provides natural gas and utility services to approximately 16 million customers. As of September 18, 2018, the Debtors, on a consolidated basis, had reported book value of assets and liabilities of approximately $71.4 billion and $51.7 billion, respectively.

4. Upon information and belief, defendant FERC is a federal administrative agency with its headquarters at 888 First Street, N.E., Washington, DC 20426. FERC has certain authority under section 824 of title 16 of the United States Code (the "**Federal Power Act**") to regulate the sale of electric energy at wholesale in interstate commerce.

**JURISDICTION AND VENUE**

5. This adversary proceeding arises in and relates to the Chapter 11 Cases. The Court has jurisdiction to consider this adversary proceeding and over the claims against FERC pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to the entry of a final order by the Court in connection with this adversary proceeding to the

extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTUAL BACKGROUND**

**The Chapter 11 Cases**

7. The Debtors' decision to seek relief under chapter 11 followed a comprehensive review of a variety of factors and the issues facing the Debtors. It represents the only viable alternative under the stark circumstances with which the Debtors are faced, and is in the best interests of all of the Debtors' stakeholders, including their millions of customers, employees, wildfire claimants, other creditors, employees, and shareholders. The Chapter 11 Cases were necessitated by a confluence of factors resulting from the catastrophic and tragic wildfires that occurred in Northern California in 2017 and 2018, and the Debtors' potential liabilities arising therefrom. The multitude of pending claims and lawsuits, and the thousands of additional claims that will be asserted, made it abundantly clear that the Debtors could not continue to address those claims and potential liabilities in the California state court system, continue to deliver safe and reliable service to its 16 million customers, and remain economically viable. As noted in the Debtors' Form 8-K filed on January 14, 2019 with the United States Securities Exchange Commission, the Debtors' potential liability with respect to the 2017 and 2018 Northern California wildfires could exceed $30 billion, without taking into account potential punitive damages, fines and penalties or damages with respect to "future claims." Under certain circumstances, the Debtors' potential liability could be substantially greater.

8. The Chapter 11 Cases represent the best means to preserve and maximize the value of the Debtors' business enterprise and are in the best interests of all of their economic stakeholders, including wildfire claimants, the Debtors' other creditors, and their business partners. Chapter 11 will provide the Debtors and all parties in interest with one forum to comprehensively address and resolve the Debtors' wildfire liabilities in a fair and expeditious manner, and will assure equality of treatment among all similarly-situated creditors of the Debtors. Additionally, the Chapter 11 Cases will assure that the Debtors have the resources—financial and otherwise—to sustain their operations,

provide critical utility services safely and reliably, and continue its efforts to rebuild and restore the communities which it serves.

9. The Debtors have already made tangible progress towards reorganization. For example, they have secured $5.5 billion in DIP financing that will allow them to continue to operate as they reorganize, and will ensure the continual income of significant cash flow from a customer base that in some instances has no other option but to rely upon the Debtors for critical services, such as electricity and natural gas. Indeed, as a utility, the Debtors effectively must reorganize for the benefit of both the community and the people that they serve.

**The Debtors' FERC-Regulated PPAs**

10. Recent changes in the energy landscape have significantly altered the Debtors' electricity procurement needs going forward. Specifically, the Debtors' current electricity supply portfolio, decreasing bundled electric load, mandated procurement beyond bundled customer needs, and continuing regulatory oversight now requires that the Debtors comprehensively assess how each PPA fits within the Debtors' energy portfolio.

11. As of December 2017, the Utility's PPAs represent contractual commitments aggregating approximately $42 billion. The Utility's $42 billion in PPA commitments are approximately three times the Debtors' 2017 gross revenues and represent the total undiscounted future obligations under PPAs that have been approved by the California Public Utilities Commission (the "**CPUC**"), as well as other future payment obligations. As of January 2019, the Utility is a counterparty as buyer under at least three hundred eighty seven (387) PPAs, which involve approximately three hundred fifty (350) counterparties, for a total of approximately 13,668 Megawatts of contracted capacity.

12. The majority of the wattage the Utility is currently obligated to purchase is pursuant to PPAs it has entered into to satisfy renewable energy requirements propounded by the State of California. Over the past approximately fifteen years, California has pursued aggressive reductions in greenhouse gas emissions from its electric sector in support of a broader state goal to transition to a sustainable, low-carbon economy. To that end, the Utility entered into hundreds of PPAs as a buyer of renewable energy to comply both with California's Renewables Portfolio Standard Program

("**RPS**"), as well as with additional mandates specific to the Debtors, which are independent of their specific bundled service load requirements or need to procure renewable technologies or small-scale renewable generation.

13. As of January 2019, the Utility is a counterparty as buyer to two hundred ninety eight (298) PPAs eligible to satisfy the State of California's RPS requirements, equivalent to approximately 7,779 Megawatts of contracted capacity. In addition to RPS-eligible contracts, the State of California has required the Utility to enter into energy storage contracts. The Utility is a buyer under nine (9) energy storage agreements, totaling 540 Megawatts of contracted capacity. In total, in order to achieve this broader state policy objective, and at the direction of the CPUC, the Utility committed billions of dollars by signing hundreds of PPAs for renewable or energy storage resources, thereby creating the infrastructure needed to support California's policy objectives.

14. The Utility's entrance into these PPAs has financed the building of thousands of Megawatts of renewable energy generation resources, and in so doing contributed to significant price reductions for renewable energy resources currently available in the market. As a result, many of the Utility's agreements to procure renewable energy resources, which are typically long-term—15 to 20-plus years in length—obligate the Debtors at rates that are significantly higher rates than are currently available in the renewable resources market. On the contrary, other load serving entities, *i.e.*, the Debtors' competitors, are able to procure required renewable energy resources at those lower rates.

15. The Debtors' contracted portfolio of non-RPS-eligible generating resources includes qualifying facilities, irrigation districts, and tolling agreements, and including electric transmission agreements is comprised of eighty (80) PPAs, totaling approximately 5,349 Megawatts of contracted capacity (excluding those energy storage resources discussed *supra* at ¶ 13). In addition, the Utility has built or contracted for utility-owned generating ("**UOG**") facilities.

16. Given that many of the Utility's power supply contracts are at above-market rates, and in light of the decrease in their bundled electric load, as discussed *infra* at ¶¶ 19-24, the Debtors have undertaken significant efforts to reduce their supply portfolio in recent years. For example, the Debtors have worked with legislators and regulators to consider the Debtors' current position when

proposing or adopting RPS and other energy storage mandates. Specifically, in regulatory proceedings at the CPUC, the Debtors have consistently raised concerns regarding continued procurement in a declining load environment, and have requested the reduction or elimination of certain procurement mandates. The Debtors' specific actions in this regard have included developing and submitting in long-term procurement proceedings before the CPUC alternative load forecasts more reflective of the market-wide declining bundled load, advocating against unneeded RPS procurement, and proposing a framework to allocate or sell to CCA and DA providers (discussed *infra* at ¶¶ 19-22) excess electricity and capacity products.

17. The Debtors also continue to evaluate the Utility's UOG facilities and have been engaged in efforts to auction certain hydroelectric assets in order to reduce the size of their supply portfolio. For example, in 2016, the Utility and a number of other stakeholders filed a proposal with the CPUC to retire the Utility's 2,200 Megawatt Diablo Canyon facility at the end of its current operating license in 2024-2025. The CPUC approved this proposal and the Utility intends to shut down Diablo Canyon when the relevant licenses expire. The Utility also filed with the CPUC the proposed sale of the Utility's Merced Falls and Narrows hydroelectric facilities. Moreover, the Utility is engaged in activities to divest additional hydroelectric facilities, including those facilities associated with the DeSabla-Centerville and Miocene projects, Kern and Tule projects, and the Deer Creek project (a portion of the Drum-Spaulding project).

18. Additional steps taken by the Debtors to reduce their energy supply portfolio on a go-forward basis include suspending voluntary procurement of RPS resources, conducting periodic sales solicitations to sell their excess RPS capacity products and electricity, and engaging in prudent contract administration practices including amending, restructuring, and terminating contracts where appropriate. Specifically, as of January 2019, the Utility is counterparty to sixty-eight (68) wholesale contracts to sell capacity products and electricity. Forty-six (46) of these contracts involve the sale of capacity products, and twenty-two (22) contracts involve the sale of electricity, including RPS-eligible electricity products.

19. In recent years, there has been a significant decrease in demand for the Debtors' electric supply service, which has resulted in the Debtors providing less electricity to fewer

customers. There are three primary reasons for this significant bundled electric load decrease: (i) the rapid expansion of retail choice programs available to customers in California, including Direct Access ("**DA**") and Community Choice Aggregation ("**CCA**"); (ii) increases in distributed generation ("**DG**"), primarily in the form of rooftop solar; and (iii) the ongoing success of California's energy efficiency ("**EE**") programs.

20. Direct Access, or DA, has become a significantly more prevalent alternative to the Debtors' services in recent years. As it does the Debtors, the CPUC regulates DA providers, which can sell electric supply directly to customers including industrial, commercial, and in some cases residential customers. While DA providers began to bring retail competition to the California electric power markets beginning in 1998, during the California energy crisis, new DA service was suspended until 2009 when California adopted California Public Utilities Code section 365.1(b), allowing the limited reopening of DA service up to a certain annual kilowatt-hour limit. As a result, the DA load in the Debtors' service territory increased from 5,574 annual gigawatt-hours ("**GWh**") in 2009 to 9,833 GWh in 2015. Moreover, while DA load has remained relatively consistent since 2015, new legislation passed in 2018 requires the CPUC to increase the current DA cap by 4,000 GWh statewide, apportioned among investor-owned utility ("**IOU**") service territories, including those of the Debtors, by June 1, 2019. While the CPUC has not yet implemented this statute, the Debtors expect that the DA load in its service area will grow when it does.

21. A significant number of consumers in the Debtors' service area also have the option of obtaining their electricity via Community Choice Aggregation, or CCA. The CPUC regulates certain aspects of CCA programs, which allow cities, counties, and other qualifying governmental entities within the Debtors' service territory to purchase and/or generate electricity for their residents and businesses. Unlike DA service, which serves only specific customers and can in turn be scattered, if a city or county elects to offer CCA service, the CCA provider generally ends up serving most of the customers in that geographic area. The CPUC has stated that its expectation is that CCA programs will serve a substantial portion of the electric load in the Debtors' service area by 2020.

22. The amount of bundled electric load serviced by DA and CCA providers has increased significantly in recent years. For example, from 2016 and 2017, the percentage of total

load in the Debtors' service territory served by DA and CCA providers increased by 8%, from 17% to 25%. From 2017 to 2018, the Utility estimates that DA and CCA load increased by another 14%, to 39%, and expects that DA and CCA providers will service 55% of the total bundled electric load in the Debtors' service area by 2020.

23. The amount of distributed generation, or DG, in the Debtors' service area has increased considerably over the last decade, primarily from the installation of residential and commercial solar energy systems driven by the Investment Tax Credit and California's Net Energy Metering structure. In 2010, the amount of bundled electric load served by DG in the Debtors' service area was 429 Megawatts. By the end of 2015, the amount of load served by DG had increased by 340% percent to 1,847 Megawatts. Additionally, in 2018, the California Energy Commission adopted regulations requiring all new California single-family homes, and apartment and condominium complexes of three stories or less, to be equipped with solar panels. This requirement will significantly further increase the load served by DG in the Debtors' service area.

24. In 2017, Energy Efficiency, or EE, projects in the Debtors' service area represented savings of 1,487 gross GWh. Moreover, while EE programs have long been a top priority for California, two 2015 bills that establish annual targets for statewide EE savings and endorse EE programs to bring existing buildings up to current energy consumptions standards are projected to continue to reduce California's energy consumption.

25. All of the Debtors' major supply portfolio decisions are subject to review by the CPUC. Under California statutory law, IOUs are required to submit specific procurement plans to the CPUC for its review and approval. To this end, the CPUC has generally initiated biennial proceedings in which IOUs submit their procurement plans, which include proposals for procurement of third-party contracted power supply. Through these proceedings, the CPUC reviews and approves each IOUs' respective procurement authority and considers the amount of procurement needed based on bundled electric load forecasts. The CPUC approved the Utility's current procurement plan in October 2015, and the Utility files periodic updates to this plan with the CPUC, including most recently in January 2019 to reflect changes in circumstances related to declining load and excess capacity products.

26. Notably to the Debtors' assessment of their PPAs, the CPUC recently indicated that it will consider the portfolio optimization activities of California's IOUs, all of which are losing substantial electric load, including allocation of third-party contracts to DA and CCA providers and auctioning off excess resources, as part of its 2019 rulemaking process.

27. The CPUC further oversees the Utility's procurement activities via various other regular proceedings, including the Energy Resource Recovery Account (ERRA) Forecast Application proceeding, which includes a forecast of procurement activities and costs for the upcoming calendar year. This proceeding involves a review of the Utility's proposed procurement and approves rates for the next calendar year. As of January 28, 2019, the CPUC has not issued a final decision with respect to the Utility's ERRA Forecast Application for 2019. The Debtors expect to evaluate the effect of that ruling on their electric supply portfolio upon its issue.

**The Necessity of this Adversary Proceeding**

28. The Debtors' "authority to reject executory contracts is vital to the basic purpose of a Chapter 11 reorganization." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("rejection can release the [D]ebtor[s'] estate[s] from burdensome obligations that can impede a successful reorganization."). The Bankruptcy Code provides a debtor the right to make assumption and rejection decisions "at any time before the confirmation of a plan." 11 U.S.C. § 365(d)(2).

29. Due to the incontrovertible economic significance of the Debtors' PPAs, as well as the continuously evolving competitive and regulatory factors affecting these agreements, the Debtors' PPA rejection and assumption decisions under section 365 of the Bankruptcy Code will play a vital role in the reorganized Debtors' post-emergence operations and financial profile. As such, it is vital to a successful reorganization that the Debtors' determinations regarding whether to assume or reject their PPAs be assessed by this Court pursuant to the business judgment standard to which any other debtor is subject.

30. As discussed *supra* at ¶ 1, on January 25, 2019, and again on January 28, 2019, FERC proclaimed that it shares with this Court so-called "concurrent jurisdiction to review and address the disposition of wholesale power contracts sought to be rejected through bankruptcy." **Exhibit 1** (NextEra Order) at 12; **Exhibit 2** (Exelon Order) at 12. According to FERC, "a party to a

Commission-jurisdictional wholesale power purchase agreement must obtain approval from both the Commission and the bankruptcy court to modify the filed-rate and reject the contract, respectively." **Exhibit 1** (NextEra Order) at 12; **Exhibit 2** (Exelon Order) at 11. Because, in FERC's view, rejection of a Commission-jurisdictional contract in bankruptcy "alters the essential terms and conditions of the contract and the filed rate," FERC believes that its "approval is required" in order for the Debtors to reject any of their PPAs. **Exhibit 1** (NextEra Order) at 13; **Exhibit 2** (Exelon Order) at 12. In other words, according to FERC, this Court's judgment is insufficient to render decisions under section 365 with respect to the Debtors' PPAs and is subject to FERC's further review and potential nullification.

31. Absent the relief sought herein, the FERC Order could very well deprive the Debtors of their congressionally-granted right to evaluate their PPAs in the context of their ongoing business operations, and to ultimately determine in their business judgment whether to assume or reject such agreements, as contemplated by section 365 of the Bankruptcy Code. The Debtors cannot take this risk given the significance of their PPAs.

**This Court Has Exclusive Jurisdiction Over the Debtors' Section 365 Rights**

32. The Debtors' PPAs are executory contracts and are property of the estate, over which this Court has exclusive jurisdiction. *See* 28 U.S.C. §§ 157, 1334(e). This Court has exclusive jurisdiction over the Debtors' rights to reject any of its PPAs under section 365 of the Bankruptcy Code. Indeed, while Congress has set forth specific exceptions to a Debtors' general section 365 authority to reject contracts, including for contracts subject to extensive regulations, the absence of any exception for contracts subject to FERC jurisdiction demonstrates that Congress intended section 365 of the Bankruptcy Code to apply to contracts subject to FERC regulation.

33. FERC does not have "concurrent" jurisdiction over this Court's exclusive authority to approve or deny the Debtors' requests to assume or reject executory contracts under section 365 of the Bankruptcy Code. In fact, FERC Action raises serious constitutional questions affecting this Court's exclusive jurisdiction over the Debtors' estate. "FERC is a creature of statute, having no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Atl. City Elec. Co. v. F.E.R.C.*, 295 F.3d 1, 8 (D.C. Cir. 2002). Congress has never given

FERC the authority to review this Court's section 365 decisions.  Rather, the Federal Power Act "charges FERC with ensuring, that "[a]ll rates and charges made, demanded, or received' by power wholesalers be 'just and reasonable." 16 U.S.C. § 824.

34. FERC's exclusive authority under the Federal Power Act, on its face, does not extend to a debtor's rights to reject PPAs under section 365.  In rejection proceedings, the Bankruptcy Court simply determines whether the debtor has properly exercised its business judgment in seeking to cease performing executory agreements such as the Debtors' PPAs here.  The Bankruptcy Court does not determine whether the rates in contracts subject to rejection are just or reasonable, nor does it attempt to modify any other terms or conditions of any such agreements.  Rather, a debtors' rejection of an executory contract results in its breach, resulting in a damages claim against the estate like any other general unsecured creditor.

**Absent an Injunction, the Debtors will Suffer Irreparable Harm**

35. Absent the injunctive relief sought herein, FERC Action would irreparably harm the Debtors by potentially stripping this Court of its exclusive jurisdiction over the Debtors' estate, threatening the integrity of the bankruptcy process, and otherwise burdening the Debtors.

36. As discussed *supra* at ¶ 32, this Court has exclusive jurisdiction over the Debtors' decision to reject any of their PPA's agreements under section 365 of the Bankruptcy Code.  The FERC Order explicitly decreeing that it has "concurrent jurisdiction to review and address the disposition of wholesale power contracts sought to be rejected through bankruptcy," is a direct threat to the Court's exclusive authority in this regard, as are the FERC Proceedings and any other FERC Action.

37. The FERC Order and any FERC Action also threaten the integrity of the Bankruptcy Code.  In order to promote a successful reorganization, section 365 of the Bankruptcy Code provides debtors with a right, subject to Bankruptcy Court approval, to rid themselves of burdensome obligations in order to facilitate a successful reorganization.  Under FERC's theory of "concurrent" jurisdiction, however, the Debtors could meet all of the requirements to reject under section 365 of the Bankruptcy Code, as well as prevailing Ninth Circuit law, only to have FERC impose a higher burden than the Bankruptcy Code requires.  Such FERC Action, including as reflected in the FERC

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Order, would amount to little more than an administrative repeal of section 365 by divining a statutory exception that was never enacted by Congress.

38. The FERC Order and FERC Action would also threaten the integrity of the Bankruptcy Code by allowing the Debtors' PPA counterparties to seize an undue advantage over other creditors. Specifically, any attempt by FERC to force the Debtors to perform under any particular PPA would convert that PPA counterparty's prepetition, unsecured rejection damages claims into first priority administrative expense claims. Such a result would threaten the equality of creditors as well as the proper functioning of the reorganization process, and would be incredibly inequitable to the Debtors' other stakeholders. The Debtors' PPA counterparties' windfall would come directly from other general unsecured creditors, *e.g.*, general unsecured creditors, including the victims of the 2017 and 2018 wildfires.

39. Moreover, the FERC Order, or other FERC Action, could very well impede confirmation of a plan of reorganization. "The bankruptcy court ha[s] an affirmative duty to ensure that [any debtor-proposed] Plan satisfie[s] all 11 U.S.C. § 1129 requirements for confirmation." *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). One of those requirements mandates compliance with "a priority scheme dictating the order in which various creditors' claims will be satisfied in the course of bankruptcy proceedings." *In re Holly Marine Towing, Inc.,* 669 F.3d 796, 800 (7th Cir. 2012). That scheme "favors equal (and simultaneous) treatment of equal allowed claims." *In re CoServ, L.L.C.*, 273 B.R. 487, 494 (Bankr. N.D. Tex. 2002). By elevating the priority of the Debtors' PPA counterparties' claims against the Debtors from general unsecured status to administrative expense status, FERC's proposed "concurrent" jurisdiction could upset this priority scheme and potentially impact plan confirmation.

40. Indeed, even the prospect that FERC could essentially vacate this Court's orders authorizing the Debtors to reject their PPAs could undermine the Debtors' plan formulation process. Specifically, the specter that FERC might attempt to exercise what it believes is its "concurrent" jurisdiction at any moment would complicate the economics of any proposed business plan and undermine related negotiations, thereby threatening the integrity of the reorganization process contemplated by Chapter 11, and irreparably harm the Debtors.

41. FERC Action would also impair the Debtors' reorganization efforts by forcing the Debtors to litigate their post-petition performance obligations in multiple fora—*i.e.*, before FERC regarding the Debtors' PPAs and before this Court regarding all other executory contracts. Further, because FERC contends its regulatory review decisions are reviewable only by a federal court of appeals, this Court could very well be powerless to remedy the lengthy and costly procedural delay FERC may cause if left to its own devices. In short, the Debtors need to know whether any rejection decision by this Court is the final word on rejection, or if they will be compelled to also seek review by FERC, which could result in an entirely incongruous outcome.

42. Given the very complicated and extensive nature of the Debtors' PPA portfolio, as well as the implications for the Debtors' business and their ongoing regulatory relationship with the CPUC, it is imperative that the Debtors make informed and thoughtful decisions regarding their energy portfolio going forward. While it is entirely possible that the Debtors ultimately decide to reject none, or a very limited number, of their PPAs, the Debtors would sustain irreparable harm if FERC were to compel a different outcome than that which the Debtors, in their business judgment, subject to the Bankruptcy Court's approval, determine is most likely to result in their successful reorganization. For example, if FERC were to compel the Utility to perform under a particular PPA that the Debtors believed—in their business judgment and after assessing their entire, interrelated PPA portfolio, bundled electric load, and regulatory obligations—was not necessary, and the Bankruptcy Court agreed, the impact across the Debtors' business would be substantial.

**Injunctive Relief would Harm Neither FERC nor the Debtors' PPA Counterparties**

43. Granting the injunctive relief sought by the Debtors would not harm FERC nor the Debtors' PPA counterparties in any way.

44. As discussed *supra* at ¶ 34, neither the requested injunctive relief, nor the Debtors' potential future rejection of any of their PPAs, would require this Court to modify a filed-rate contract, or to otherwise determine whether the rates therein are just and reasonable, in derogation of FERC's exclusive jurisdiction over such matters. Rather, any rejection of a PPA by the Debtors would give full effect to the FERC-approved rates therein by allowing breach of contract damages at those filed rates through the claims process.

45. Nor would the relief sought herein harm the Debtors' PPA counterparties. Such counterparties will still be able to challenge any rejection motion the Debtors may submit and, if unsuccessful, will be entitled to breach of contract damages claims based on the FERC-approved rates therein.

## COUNT ONE

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201)**

46. The Debtors incorporate by reference their allegations in Paragraphs 1-45 as if set forth fully herein.

47. Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

48. Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007).

49. There is a substantial controversy between the Debtors and FERC of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

50. A declaratory judgment confirming this Court's exclusive jurisdiction over the Debtors' rights to reject any of their PPAs under section 365 of the Bankruptcy Code, and further declaring that FERC does not have "concurrent" jurisdiction, or any jurisdiction, over the determination of whether the Debtors' rejection of any of their PPAs should be authorized, and that the Debtors do not need to obtain approval from FERC to reject any of their PPAs, is therefore both necessary and appropriate.

## COUNT TWO

### (Enforcement of Section 362 Automatic Stay)

51. The Debtors incorporate by reference their allegations in Paragraphs 1-50 as if set forth fully herein.

52. The Debtors' existing PPAs are executory contracts under section 365 of the Bankruptcy Code.

53. Executory contracts automatically become property of the bankruptcy estates once the bankruptcy is filed. 11 U.S.C. § 365(a).

54. The automatic stay prohibits "all entities" from taking any "act" to "exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

55. FERC Action would constitute an exercise of "control" over the Debtors' property.

56. The Debtors' potential rejection or breach of their PPAs does not implicate the police or regulatory powers exception to the automatic stay. Rather, any potential rejection or breach here purely concerns the economic interests of private parties.

57. Any FERC Action would thus be a violation of the automatic stay.

58. Issuing an order enforcing the automatic stay as to any FERC Action is therefore necessary and appropriate.

## COUNT THREE

### (Section 105 Preliminary and Permanent Injunction)

59. The Debtors incorporate by reference their allegations in Paragraphs 1-58 as if set forth fully herein.

60. A Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

61. A Bankruptcy Court may, therefore, in its discretion, issue injunctive relief under section 105 of the Bankruptcy Code in order to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to the case before it.

62. The Debtors are reasonably likely to reorganize successfully.

63. FERC Action would irreparably harm the Debtors and their stakeholders by threatening this Court's exclusive jurisdiction over the Debtors' estates, as well as the integrity of the Debtors' reorganization process, and otherwise burden the Debtors.

64. This Court's issuance of relief enjoining any FERC Action would not harm FERC or the Debtors' PPA counterparties in any way.

65. The requested injunctive relief will serve the public interest by allowing this Court to retain its exclusive jurisdiction over these Chapter 11 Cases and the Debtors' estate, facilitating the Debtors' successful reorganization, and by treating all general unsecured creditors equally.

66. Preliminary and permanent injunctive relief pursuant to section 105 of the Bankruptcy Code enjoining any FERC Action is therefore necessary and appropriate.

WHEREFORE, the Debtors respectfully request relief as follows:

a. That this Court issue a declaratory judgment confirming its exclusive jurisdiction over the Debtors' rights to reject any of its PPAs under section 365 of the Bankruptcy Code, and further declaring that FERC does not have "concurrent" jurisdiction, or any jurisdiction, over the determination of whether the Debtors' rejection of any of their PPAs should be authorized, and that the Debtors do not need to obtain approval from FERC to reject any of their PPAs;

b. That this Court, pursuant to section 362 of the Bankruptcy Code, issue an order enforcing the automatic stay as to any FERC Action;

c. That this Court, to the extent the automatic stay does not apply, exercise its powers under section 105 of the Bankruptcy Code and preliminarily and permanently enjoin any FERC Action.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Dated: January 29, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: /s/ Peter J. Benvenutti
　　　Peter J. Benvenutti

*Proposed Attorneys for Debtors
and Debtors in Possession*